Filed 12/16/25

<u>CERTIFIED FOR PUBLICATION</u>

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### FIFTH APPELLATE DISTRICT

| | |
|---|---|
| PICAYUNE RANCHERIA OF THE CHUKCHANSI INDIANS,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>NORTH FORK RANCHERIA OF MONO INDIANS,<br><br>    Defendant and Appellant. | F088551<br><br>(Super. Ct. No. MCV072004)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Madera County. Michael J. Jurkovich, Judge.

Maier Pfeffer Kim Geary & Cohen, John A. Maier; Wilmer Cutler Pickering Hale and Dorr, Christopher E. Babbitt, Seth P. Waxman, Joshua A. Vittor, Kyle T. Edwards, and Britany Riley-Swanbeck for Defendant and Appellant.

Paul Hastings, Navi Singh Dhillon, Sean D. Unger, Lucas V. Grunbaum, Max Epstein-Shafir for Plaintiff and Respondent.

-ooOoo-

In 2011, the North Fork Rancheria of Mono Indians (North Fork), a federally recognized tribe, obtained a determination from the Secretary of the United States

Department of the Interior (Interior Secretary) that its proposed off-reservation casino in Madera County "would be in the best interest of the Indian tribe and its members, and would not be detrimental to the surrounding community." (25 U.S.C. § 2719(b)(1)(A).) In 2012, Governor Edmund G. Brown, Jr. concurred in the Interior Secretary's determination and signed a tribal-state compact with North Fork addressing the casino's construction and operation. The compact provided for a casino containing 2,000 slot machines and 40 gaming tables to be built on a 305-acre site north of the City of Madera just off State Route 99.

In 2013, the Legislature ratified the tribal-state compact. In the November 2014 election, California's voters rejected the ratification statute. In 2016, the Picayune Rancheria of the Chukchansi Indians (Picayune-Chukchansi), a federally recognized tribe that operates an on-reservation casino in Madera County, filed this lawsuit against the Governor and North Fork, contending the Governor's concurrence was void ab initio. Proceedings were stayed pending the Supreme Court's decision in *United Auburn Indian Community of Auburn Rancheria v. Newsom* (2020) 10 Cal.5th 538 (*United Auburn*) and this court's decision in *Stand Up for California! v. State of California* (2021) 64 Cal.App.5th 197 (*Stand Up II*). Although "nowhere in the California Constitution is the Governor granted explicit authority to concur," the Supreme Court held the Governor had the implied authority to concur in the Interior Secretary's determination. (*United Auburn*, *supra*, at p. 543.) We concluded "the people retained the power to annul a concurrence by the Governor and the voters exercised this retained power at the 2014 election by impliedly revoking the concurrence for the Madera site." (*Stand Up II*, *supra*, at p. 201.)

In 2024, the trial court agreed with Picayune-Chukchansi's interpretation of *Stand Up II* and granted summary judgment on Picayune-Chukchansi's declaratory relief claim against North Fork. The resulting judgment stated: "Through the People's vote on Proposition 48, the Governor's concurrence has been annulled rendering it void *ab initio*, and as such the Governor's concurrence never took effect and is not in effect."

North Fork appealed, contending the judgment is an improper advisory opinion because (1) the issue of the state-law status of the Governor's concurrence is moot; (2) the state-law status of the Governor's concurrence has no bearing on its authority to operate the casino under federal law; and (3) as a matter of substantive state law, the Governor's concurrence was not void ab initio. As explained below, we disagree. We conclude that when California's voters impliedly revoked the Governor's concurrence, they rendered it void ab initio.

Furthermore, we cannot conclude the status of the Governor's concurrence is a moot issue as between Picayune-Chukchansi and North Fork (as opposed to mootness between Picayune-Chukchansi and the Governor). North Fork's arguments present questions of federal law for which there is no direct precedent, and we cannot resolve the merits of those arguments with the level of certainty needed to conclude there is no prospect of a remedy that can have a practical, tangible impact on the parties.

We therefore affirm the judgment in Picayune-Chukchansi's favor.

## FACTS

Plaintiff Picayune-Chukchansi is a federally recognized Indian tribe that holds Indian trust lands in Coarsegold, Madera County, California. Picayune-Chukchansi refers to the trust lands as the tribe's Rancheria lands and asserts the lands were "first founded in or around 1912." Picayune-Chukchansi owns and operates the Chukchansi Gold Resort & Casino, a class III gaming facility, on the Rancheria lands. The major transportation corridor closest to the Rancheria lands is State Route 99, which is approximately 32 miles away.

Defendant and intervenor North Fork also is a federally recognized Indian tribe. A March 2010 memorandum of the Bureau of Indian Affairs (BIA) of the United States Department of the Interior (DOI) stated the tribe had more than 1,750 citizens, with 982 adult tribal citizens living in California. A 2016 document executed on behalf of the Interior Secretary asserted North Fork had more than 2,000 tribal citizens. The 80-acre

North Fork Rancheria is located in the Sierra foothills adjacent to the Sierra National Forest in a scenic and environmentally sensitive area.

*Overview of Federal Statutes*[1]

The Indian Reorganization Act of 1934 (IRA; 25 U.S.C. § 5101 et seq.) authorizes the Interior Secretary to acquire land and hold it in trust to provide land for Indians. The Indian Gaming Regulatory Act of 1988 (IGRA; 18 U.S.C. §§ 1166-1167; 25 U.S.C. § 2701 et seq.) provides "a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments." (25 U.S.C. § 2702(1).) Class III gaming is the type of gambling practiced in casinos in Nevada. (25 U.S.C. § 2703(6)–(8).) Class III gaming is lawful on Indian lands when certain statutory conditions have been met. (See 25 U.S.C. § 2710(d).) For land taken into trust after October 17, 1988 (like the Madera Site), gaming is prohibited by IGRA, unless an exception applies. (25 U.S.C. § 2719(a), (b); see 25 C.F.R. § 292 (2008) ["Gaming on Trust Lands Acquired After October 17, 1988"].)

The exception relied upon by North Fork for the Madera Site provides that land taken into trust after October 17, 1988, may be used for gaming if "the [Interior] Secretary, after consultation with the Indian tribe and appropriate State and local officials, including officials of other nearby Indian tribes, determines that a gaming establishment on newly acquired lands [1] would be in the best interest of the Indian tribe and its members, and [2] would not be detrimental to the surrounding community, *but only if the Governor of the State in which the gaming activity is to be conducted concurs in the [Interior] Secretary's determination*." (25 U.S.C. § 2719(b)(1)(A), italics added.) This opinion refers to this determination by the Interior Secretary as the "two-part determination." In contrast to the authority granted the Interior Secretary by federal

---

[1] Further detail about the history of federal and state regulation of gaming on Indian lands is provided in *United Auburn*, *supra*, 10 Cal.5th at pages 544 through 547.

statute, the Governor's authority to concur must come from state law.  (*United Auburn*, *supra*, 10 Cal.5th at pp. 548–549, fn. 4.)

To invoke the foregoing exception, at least three conditions must be met:  (1) the Interior Secretary must issue a two-part determination; (2) the Governor of the state where the trust lands are located must concur in the two-part determination; and (3) there must be a valid tribal-state compact or valid procedures prescribed by the Interior Secretary (25 U.S.C. § 2710(d)(1)(C), (d)(7)(B)(vii)).  As in *Stand Up for California! v. State of California* (2016) 6 Cal.App.5th 686 (*Stand Up I*), abrogated by *United Auburn, supra,* 10 Cal.5th 538 and *Stand Up II*, the subject of this litigation is the validity of the Governor's concurrence.  (See *Stand Up II*, *supra*, 64 Cal.App.5th at p. 201.)

*The Proposed Casino-Resort*

In March 2005, North Fork submitted a formal fee-to-trust application to the BIA, requesting the DOI take into trust for North Fork's benefit a 305.49-acre parcel in Madera County (the Madera Site).  The Madera Site is adjacent to State Route 99.  It is just north of the City of Madera and is within the city's sphere of influence.  North Fork's fee-to-trust application proposed building and operating a large off-reservation casino and resort on the site.  The casino-resort would include class III gaming, restaurant and retail facilities, public space, a 200-room hotel tower, and approximately 4,500 parking spaces, including 2,000 spaces in a multi-level parking garage.

"At the time of the fee-to-trust application, the parcel was owned by a subsidiary of North Fork's development partner.  That entity, Nevada-based Station Casinos, LLC, is partially owned by Red Rock Resorts, Inc., a publicly traded company." (*Stand Up II*, *supra*, 64 Cal.App.5th at p. 202.)  A quarterly report on Form 10-Q filed by Red Rock Resorts, Inc. with the Securities and Exchange Commission in 2023 provided the following information.  The company proposes to continue to assist North Fork in developing the casino-resort and, if a proposed management agreement is approved by the chair of the National Indian Gaming Commission, to assist North Fork in operating

5.

the project; the project is expected to include approximately 2,000 slot machines, 40 table games, and several restaurants; and the project's future development cost are expected to be between $375 and $425 million.

In September 2011, the DOI issued a "RECORD OF DECISION" announcing the Interior Secretary's two-part determination that North Fork's proposed casino (1) would "be in the best interest of the Tribe and its members" and (2) "would not be detrimental to the surrounding community."

*Governor's Concurrence*

On August 30, 2012, the Governor issued a letter to the Interior Secretary concurring in the two-part determination regarding a class III gaming facility at the Madera Site. The letter stated: "While I am reluctant to allow the expansion of gaming on land currently ineligible for it, I concur in your determination in this case because of several exceptional circumstances." One of the circumstances was that the Wiyot Tribe had agreed to forgo gaming on its land, which included environmentally sensitive areas, in exchange for a direct share of the new facility's revenues, and the two tribes were comprised of approximately 2,500 native Californians. Based on these numbers, the letter stated: "A large tribal population will directly benefit from the gaming facility." Addressing the controversial issue of additional off-reservation casinos in California, the letter stated the Governor expected "there will be few requests from other tribes that will present the same kind of exceptional circumstances to support a similar expansion of tribal gaming land."

*Tribal-State Compact*

Before the Governor issued the concurrence, he and North Fork negotiated a tribal-state compact containing the terms and conditions under which class III gaming would be conducted on the Madera Site. Tribal-state compacts address many topics, including the scope of the games, standards for operating the games, regulatory responsibility, allocation of criminal and civil jurisdiction, liquor sales, and taxes on retail

6.

and restaurant outlets.  (25 U.S.C. § 2710(d)(3)(C).)  The Governor undertook this task because he is designated by statute as the state officer responsible for negotiating and executing tribal-state compacts that allow for class III gaming on Indian lands within California.  (Gov. Code, § 12012.25, subd. (d).)  The California Constitution also authorizes the Governor "to negotiate and conclude [tribal-state] compacts, subject to ratification by the Legislature[.]"  (Cal. Const., art. IV, § 19, subd. (f).)

On August 31, 2012, the day after the Governor issued his concurrence letter, he and North Fork executed the tribal-state compact they had negotiated before the concurrence was issued.  The compact was 111 pages long, excluding its cover page, table of contents, and appendices.  Pursuant to section 4.5(f) of the compact, North Fork's obligations to make payments to mitigate the economic impact of the proposed casino-resort on Picayune-Chukchansi terminated if Picayune-Chukchansi pursued or financed any administrative or legal challenges to various project approvals.  In accordance with the California Constitution, the Governor forwarded the compact to the Legislature for ratification.  (See Cal. Const., art. IV, § 19, subd. (f).)

*Federal Lawsuit Against the DOI*

"In November 2012, the Interior Secretary, having made his two-part determination and obtained the Governor's concurrence, issued a decision approving North Fork's fee-to-trust application for the [Madera Site].  This decision was implemented in February 2013, when a grant deed conveying the 305 acres to the federal government in trust was executed by North Fork's development partner, accepted by the Interior Secretary, and recorded in the County of Madera."  (*Stand Up II*, *supra*, 64 Cal.App.5th at p. 203.)

Picayune-Chukchansi challenged the Interior Secretary's decisions to take the off-reservation Madera Site into trust and to allow gaming on that site by filing a complaint in December 2012 against the United States, the DOI, the Interior Secretary, and an assistant secretary for Indian affairs.  The complaint was filed in the United States

7.

District Court for the District of Columbia and requested declaratory relief and a permanent injunction prohibiting the Interior Secretary from taking the Madera Site into trust.  In January 2013, the case was consolidated with a lawsuit filed earlier by Stand Up for California! and five other plaintiffs.  (*Stand Up for California! v. U.S. Dept. of the Interior* (D.D.C. 2016) 204 F.Supp.3d 212, 226, 234.)

*Stand Up for California! State Court Action*

In March 2013, Stand Up for California! and Barbara Leach filed a lawsuit against the Governor in Madera County Superior Court (case No. MCV062850), alleging he violated the California Constitution when he concurred in the Interior Secretary's two-part determination.  (*Stand Up II*, *supra*, 64 Cal.App.5th at pp. 203–204.)  They sought a writ of mandate setting aside the concurrence.  (*Id*. at p. 204.)[2]

While the consolidated federal action in the District of Columbia and the first Madera County Superior Court action were pending, the Legislature passed Assembly Bill No. 277 (2013-2014 Reg. Sess.), which ratified the tribal-state compact executed on August 31, 2012.  (*Stand Up II*, *supra*, 64 Cal.App.5th at p. 204; Gov. Code, § 12012.59.) On July 3, 2013, the Governor signed the legislation, and it became chapter 51 of the Statutes of 2013.  (*Stand Up II*, *supra*, at p. 204.)  The ratified compact was forwarded to the Interior Secretary, who published a notice in the Federal Register stating the compact had been approved and was taking effect to the extent it was consistent with IGRA.  (78 Fed.Reg. 62649 (Oct. 22, 2013).)

---

[2]    This state court action was an appropriate vehicle for challenging the validity of the concurrence (an issue of state law) because similar claims pursued by Stand Up for California! in federal court were dismissed "for failure to join an indispensable party— California."  (*Stand Up for California! v. U.S. Dept. of the Interior* (D.C. Cir. 2018) 879 F.3d 1177, 1181.)

*The Referendum and Proposition 48*

In July 2013, opponents of the proposed casino initiated the process for presenting a statewide referendum rejecting the compact ratification statute. (*Stand Up II*, *supra*, 64 Cal.App.5th at p. 204.) Enough valid signatures were obtained on their petition to qualify the referendum for the November 4, 2014 General Election ballot. (*Id*. at p. 205.) "The measure was designated Proposition 48 and submitted to the electorate. At the election, approximately 4.2 million Californians (61 percent) voted 'No' on Proposition 48, thereby rejecting the ratification statute." (*Stand Up II*, *supra*, at p. 205.)

*Demurrers in Case No. MCV062850*

In August 2013, North Fork was granted leave to intervene in case No. MCV062850. (*Stand Up II*, *supra*, 64 Cal.App.5th at p. 204.) North Fork, the Governor, and the other state defendants filed demurrers. (*Ibid*.) In March 2014, before the referendum rejected the tribal-state compact, the trial court sustained the demurrers without leave to amend, concluding the Governor's power to concur arose by implication from his constitutional authority to negotiate and execute tribal-state compacts. (*Ibid*.; see Cal. Const., art. IV, § 19, subd. (f).) After judgment was entered, the plaintiff appealed. (*Stand Up II*, *supra*, at p. 205.) This court assigned the appeal case No. F069302.

*Federal Action Regarding the Compact*

After California's voters rejected the tribal-state compact, the state refused to negotiate another compact with North Fork. Consequently, in March 2015, North Fork filed an action in the United States District Court for the Eastern District of California to compel the state to negotiate a new compact in good faith. (*Stand Up for California! v. U.S. Dept. of the Interior* (E.D.Cal. 2018) 328 F.Supp.3d 1051, 1056, affd. in part & revd. in part (9th Cir. 2020) 959 F.3d 1154.) We refer to this federal lawsuit as the "Federal Compact Action." In November 2015, the district court granted North Fork's request and ordered North Fork and the state to conclude a compact within 60 days. (*Id*.

9.

at p. 1057.) In January 2016, after the deadline had passed, the district court appointed a mediator and directed the mediator to select from the two proposed compacts the one that best comported with federal law. (*Ibid*.) The state did not consent to the compact selected by the mediator and the mediator informed the Interior Secretary of the lack of consent. (*Ibid*.)

## PROCEEDINGS

In March 2016, Picayune-Chukchansi filed a complaint for declaratory relief combined with a petition for writ of mandate against the Governor. Picayune-Chukchansi sought a "judgment declaring that the Governor's concurrence did not take effect and is not in effect" and requested a writ of mandate "directing the Governor to vacate and set aside the concurrence and to take all action as may be necessary to notify the Secretary that the concurrence did not take effect and is not in effect." The Madera County Superior Court assigned the lawsuit case No. MCV072004.

*Initial Demurrers*

In May 2016, the Governor filed a demurrer. On July 8, 2016, North Fork was granted leave to intervene. In seeking intervention, North Fork took the position that "[i]f Picayune were to succeed in obtaining a declaration or writ of mandamus invalidating the Governor's concurrence, North Fork's gaming project would be placed in jeopardy." The

trial court granted North Fork's request to intervene.  Later that day, North Fork filed a demurrer to Picayune-Chukchansi's pleading.[3]

In October 2016, before the hearing on the demurrers, the Third District issued *United Auburn Indian Community of Auburn Rancheria v. Newsom* (2016) 4 Cal.App.5th 35, review granted January 25, 2017, S238544.  In that decision, the Third District rejected the contentions "that the Governor lacked the power to concur under California law, that the Governor's concurrence was a legislative act that violated the separation of powers, and that the Governor exceeded his authority by entering into compact negotiations for land that hadn't yet been taken into trust by the Interior Secretary." (*United Auburn*, *supra*, 10 Cal.5th at p. 548.)  As a result, the Third District affirmed the judgment of dismissal entered after the superior court sustained the Governor's demurrer. (*Ibid.*)

In November 2016, the Madera County Superior Court heard arguments on the demurrers in this action.  On December 2, 2016, the court issued its written ruling to sustain both demurrers without leave to amend and directed counsel for the Governor to prepare a judgment of dismissal.  That ruling relied on *United Auburn Indian Community of Auburn Rancheria v. Newsom*, *supra*, 4 Cal.App.5th 35.

On December 12, 2016, this court issued *Stand Up I*, *supra*, 6 Cal.App.5th 686.  In that action, the plaintiffs' complaint challenged the Governor's authority to concur in the

---

**3**     Later in July 2016, the Interior Secretary approved a document called Secretarial Procedures for the North Fork Rancheria of Mono Indians (the secretarial procedures) for the purpose of authorizing class III gaming on the Madera Site in the absence of a state-approved compact.  (*Stand Up II*, *supra*, 64 Cal.App.5th at p. 204.)  The 102-page secretarial procedures (excluding the cover page, table of contents and appendices) contain detailed provisions governing many topics, including how the gaming will be conducted.  A DOI letter dated July 29, 2016, notified North Fork and the state that the secretarial procedures were in effect.  (*Ibid.*; *Stand Up for California! v. U.S. Dept. of the Interior*, *supra*, 328 F.Supp.3d at p. 1057.)  The secretarial procedures take the place of the tribal-state compact rejected by California's voters.

11.

Interior Secretary's two-part determination. North Fork, the Governor, and other state defendants filed demurrers. The Madera County Superior Court sustained the demurrers without leave to amend. (*Id*. at p. 691.) In reviewing that decision, we determined "[t]he Governor's concurrence is invalid under the facts alleged in this case." (*Id*. at p. 705.) We reversed the judgment and directed the trial court to enter a new order overruling the demurrers. (*Ibid*.)

In February 2017, the parties stipulated to the trial court vacating its December 2, 2016 order sustaining the demurrers in this case and setting a conference in May 2017 to update the court on whether the California Supreme Court had granted review of *Stand Up I* and the status of the California Supreme Court's proceedings in *United Auburn*. In effect, the trial court stayed proceedings in the present case pending resolution of the appellate proceedings in the other cases. That stay remained in place until September 2021.

*Proceeding in Other Cases During the Stay*

In March 2017, the Supreme Court granted review of *Stand Up I* and deferred briefing pending its decision in *United Auburn*.

Three and a half years after the stipulated order was filed, the California Supreme Court decided *United Auburn*, *supra*, 10 Cal.5th 538. The court concluded California law empowered the Governor to concur in the Interior Secretary's two-part determination. (*Id*. at p. 543.) As a result, it affirmed the order sustaining the Governor's demurrer and subsequent judgment of dismissal. (*Id*. at pp. 544, 548.)

In October 2020, the California Supreme Court transferred *Stand Up I* to this court with instructions to vacate our decision and reconsider the matter in light of *United Auburn*, *supra*, 10 Cal.5th 538. In May 2021, after the parties submitted their briefs and this court denied Picayune-Chukchansi's application to file an amicus curiae brief, we issued *Stand Up II*, *supra*, 64 Cal.App.5th 197, which concluded:

"[T]he facts of this case are distinguishable from those in *United Auburn* because at the November 2014 general election California voters rejected the Legislature's ratification of the tribal-state compact for gaming at the Madera site. As described below, we conclude the people retained the power to annul a concurrence by the Governor and the voters exercised this retained power at the 2014 election by impliedly revoking the concurrence for the Madera site. As a result, the concurrence is no longer valid, and the demurrer[s] should have been overruled." (*Stand Up II*, *supra*, 64 Cal.App.5th at p. 201.)[4]

The Governor and North Fork filed separate petitions for review with the California Supreme Court.

*Further Proceedings in This Action*

In September 2021, the Supreme Court denied the petitions for review of *Stand Up II*. With that uncertainty removed, the parties in this action filed competing motions for judgment on the pleadings. In July 2022, the trial court issued a tentative ruling on the motions for judgment on the pleadings, but did not adopt that ruling to give Picayune-Chukchansi an opportunity to file a formal motion for leave to amend. In October 2022, Picayune-Chukchansi filed its motion for leave to amend.

In December 2022, after hearing arguments on the motion for leave to amend, the trial court (1) granted Picayune-Chukchansi's leave to file a first amended complaint for declaratory relief; (2) denied it leave to amend its petition for writ of mandate (3) adopted its tentative ruling on the competing motions for judgment on the pleadings, which granted the Governor's and North Fork's motions for judgment on the pleading solely as to Picayune-Chukchansi's petition for writ of mandate without leave to amend.

The trial court concluded mootness did not justify denying leave to amend the complaint. The court denied leave to amend the petition for writ of mandate because

---

**4** Use of the present tense verb "is" in the phrase "is no longer valid" described the concurrence's state of being at the time of the opinion. Thus, that phrase did not include an explicit determination that the concurrence was or was not void from its inception (i.e., void ab initio).

Picayune-Chukchansi was unable to allege the Governor had a clear and present ministerial duty enforceable through such a writ. In particular, the trial court concluded the Governor was not mandated to take the corrective action of notifying the Interior Secretary that his August 2012 concurrence had been annulled by Proposition 48.

Picayune-Chukchansi filed a first amended complaint seeking (1) a judicial declaration that the vote on Proposition 48 annulled the Governor's August 2012 concurrence, rendering it void ab initio such that it never took effect and was not in effect; (2) a judicial declaration that North Fork could not conduct class III gaming on the Madera Site by relying on the void concurrence; and (3) injunctive relief precluding the Governor and North Fork from taking any action predicated on the Governor's concurrence ever having had legal effectiveness.

The Governor and North Fork filed separate demurrers. In July 2023, the trial court filed a tentative ruling that proposed sustaining the Governor's demurrer without leave to amend and overruling North Fork's demurrer. The court concluded an actionable dispute did not exist between Picayune-Chukchansi and the Governor and North Fork's demurrer attacked the prayer for relief rather than showing a cause of action had not been stated. The order sustaining the Governor's demurrer is challenged in case No. F086849.

*Motions for Summary Judgment*

In September 2023, North Fork filed a motion for summary judgment. Picayune-Chukchansi filed its own motion for summary judgment. After oppositions and replies were filed, the trial court held a hearing in May 2024. Three days before the hearing, the court filed an 18-page tentative ruling granting Picayune-Chukchansi's motion and denying North Fork's motion. Following the hearing, the court adopted its tentative ruling.

*Judgment and Appeal*

On June 26, 2024, the trial court filed a "JUDGMENT IN FAVOR OF PICAYUNE AND AGAINST NORTH FORK." The judgment stated: "Through the People's vote on Proposition 48, the Governor's concurrence has been annulled rendering it void *ab initio*, and as such the Governor's concurrence never took effect and is not in effect." The judgment attached a copy of the court's tentative ruling that had been adopted as the court's order on the summary judgment motions. North Fork filed this appeal.

## DISCUSSION

North Fork contends the declaratory relief granted in the judgment must be reversed because it is an improper advisory opinion. North Fork presents two arguments to support its claim that the judgment is merely an advisory opinion. First, North Fork contends that, even if the concurrence's state-law status was relevant to North Fork's ability to operate a casino on the Madera Site, the issue is moot. Second, as a matter of federal law, North Fork contends the state-law status of the Governor's concurrence has no bearing on its authority to operate the casino. North Fork's third argument asserts the declaratory judgment is wrong on the merits because, as a matter of substantive law, the Governor's concurrence was not void ab initio. We disagree.

I.      MOOTNESS

A.      Basic Principles

California courts have a duty to decide actual controversies by a judgment that can be carried into effect. (*In re D.P.* (2023) 14 Cal.5th 266, 276.) Restated in the negative, courts have a duty not to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law that cannot affect the matter in issue in the case before it. A case becomes moot when events render it impossible for the court, if it should decide the case in favor of plaintiff, to grant him any effective relief. "For relief

15.

to be 'effective,' two requirements must be met. First, the plaintiff must complain of an ongoing harm. Second, the harm must be redressable or capable of being rectified by the outcome the plaintiff seeks." (*Ibid*.) Other courts have defined "[t]he legal test for effective relief [a]s whether there is a 'prospect of a remedy that can have a practical, tangible impact on the parties' conduct or legal status.' " (*Delta Stewardship Council Cases* (2020) 48 Cal.App.5th 1014, 1053; *In re I.A.* (2011) 201 Cal.App.4th 1484, 1490.)

### B. Effective Relief

North Fork contends the trial court's declaratory judgment cannot have any effect. In particular, North Fork asserts the Interior Secretary's 2012 decision to take the Madera Site into trust and the 2016 decision to issue secretarial procedures have been challenged in federal court, Picayune-Chukchansi lost those challenges, the judgments are now final, and the relevant statute of limitations has expired. Under North Fork's interpretation of federal law, Picayune-Chukchansi has "no avenue to challenge the [Interior] Secretary's decisions underpinning North Fork's ability to game."

Picayune-Chukchansi asserts "it is not challenging any of the [Interior] Secretary's past decisions" and North Fork's argument that the validity of the Governor's concurrence has no bearing on its ability to offer gaming at the Madera Site is a merits issue, not a mootness issue. Picayune-Chukchansi contends "North Fork cannot rest its mootness argument on an assumption that its view of that merits question is correct."

*Chafin v. Chafin* (2013) 568 U.S. 165 (*Chafin*) involved a custody battle over the couple's daughter that arose after the mother was deported to Scotland and the daughter remained with her father in Alabama. (*Id*. at p. 170.) The mother filed a petition in federal district court under the Hague Convention of the Civil Aspects of International Child Abduction (Convention) and the implementing federal statute seeking an order for the daughter's return to Scotland. (*Ibid*.) The district court granted the petition for return, the mother left with the child for Scotland, and, once there, initiated custody

16.

proceedings in which the Scottish court granted her interim custody and a preliminary injunction prohibiting the father from removing the child from Scotland. (*Id*. at p. 171.) The father appealed the district court's order to the Eleventh Circuit, which dismissed the appeal as moot. (*Ibid*.) The United States Supreme Court vacated the dismissal and remanded for further proceedings.

The mother in *Chafin* argued the case was moot because the district court lacked the authority to issue a re-return order either under the Convention or the court's inherent equitable powers. The United States Supreme Court reject her approach, stating "that argument—which goes to the meaning of the Convention and the legal availability of a certain kind of relief—confuses mootness with the merits." (*Chafin*, *supra*, 586 U.S. at p. 174.) In the court's view, the father's claim "for re-return—under the Convention itself or according to general equitable principles—cannot be dismissed as so implausible that it is insufficient to preserve jurisdiction [citation], and his prospects of success are therefore not pertinent to the mootness inquiry." (*Ibid*.)

Here, we conclude North Fork's arguments about mootness suffer from the same defect as those asserted by the mother in *Chafin*. Those arguments ask for a merits question to be resolved as the basis for concluding this case is moot. What effect, if any, California voter's annulment of the concurrence will have on North Fork's ability to operate a casino on the Madera Site presents questions of federal law for which there is no direct precedent. We cannot answer those questions with the level of certainty needed to conclude there is no " 'prospect of a remedy that can have a practical, tangible impact on the parties' conduct or legal status.' " (*Delta Stewardship Council Cases*, *supra*, 48 Cal.App.5th at p. 1053.) Cases addressing the validity of a state legislature's ratification of the 19th Amendment or the retrocession of jurisdiction to the federal government by a state under section 1323 of title 25 of the United States Code do not establish that the voidness of the Governor's concurrence from its inception will have no impact on how IGRA and related federal regulations are applied to North Fork's project going forward.

17.

(See *Leser v. Garnett* (1922) 258 U.S. 130; *United States v. Lawrence* (9th Cir. 1979) 595 F.2d 1149, 1151; *Omaha Tribe of Nebraska v. Village of Walthill* (D.Neb. 1971) 334 F.Supp. 823, affd. (8th Cir. 1972) 460 F.2d 1327, cert. denied (1973) 409 U.S. 1107 (1973).) Consequently, we cannot conclude the controversy regarding the Governor's concurrence is moot.

## II. THE GOVERNOR'S CONCURRENCE WAS VOID AB INITIO

We next consider the merits and whether the trial court erred in concluding the people's vote on Proposition 48 annulled the Governor's concurrence and rendered it void ab initio—that is, as though it never took effect and is not in effect.[5]

### A. *Background*

The question whether the Governor's concurrence was void ab initio was not decided by the California Supreme Court in *United Auburn*, *supra*, 10 Cal.5th 538, or by this court in *Stand Up II*, *supra*, 64 Cal.App.5th 197. However, context for that issue is provided by the series of legal questions this court identified and resolved in *Stand Up II*. That series of questions addressed the authority of the people to eliminate or invalidate the Governor's concurrence in the two-part determination of the Interior Secretary. (See *Stand Up II*, *supra*, 64 Cal.App.5th at pp. 210–216 [pt. II.B., "The People's Authority To Invalidate a Concurrence"].) The opinion's introduction summarized our conclusions as follows:

---

**5** Black's Law Dictionary (12th ed. 2024) defines "void ab initio" as "[n]ull from the beginning, as from the first moment of a contract is entered into. A contract is void ab initio if it seriously offends law or public policy, in contrast to a contract that is merely voidable at the election of one party to the contract." An example of this concept's application is provided by the federal decisions that hold acts done in violation of the automatic bankruptcy stay are void ab initio and have no legal effect. (See Desjardins, *Tribal Sovereignty & Sovereign Immunity in Bankruptcy* (2024) 101 Wash. U.L. Rev. 1735, 1740; see also, *Styne v. Stevens* (2001) 26 Cal.4th 42, 46 ["any contract of an unlicensed person for talent agency services is illegal and void ab initio"].)

"As described below, we conclude the people retained the power to annul a concurrence by the Governor and the voters exercised this retained power at the 2014 election by impliedly revoking the concurrence for the Madera site.  As a result, the concurrence is no longer valid, and the demurrer[s] should have been overruled."  (*Stand Up II*, *supra*, 64 Cal.App.5th at p. 201.)

The first question we addressed was "whether the Governor's concurrence, once given, can be invalidated by subsequent action of the electorate."  (*Stand Up II*, *supra*, 64 Cal.App.5th at p. 210.)  We concluded "the people of California retained the authority to annul a concurrence in the Interior Secretary's two-part determination after it has been issued by the Governor.  In other words, the Governor's exercise of the defeasible concurrence power is itself an act capable of being avoided or undone by the people." (*Id*. at p. 212.)

The second question we addressed was procedural in nature—that is, how the authority to annul a concurrence could be exercised.  (*Stand Up II*, *supra*, 64 Cal.App.5th at p. 212.)  We concluded "a referendum is an appropriate mechanism for annulling a Governor's concurrence in the Interior Secretary's two-part determination."  (*Id*. at p. 214.)

The third question we addressed was "whether the people may *impliedly* annul the Governor's concurrence."  (*Stand Up II*, *supra*, 64 Cal.App.5th at p. 214.)  We concluded that, in voting on a referendum, "the people may impliedly express their will to annul a concurrence issued by the Governor."  (*Ibid*.)

The fourth question addressed whether the people actually had exercised their retained power.  We phrased the question as "whether Proposition 48 is properly interpreted as an exercise of the people's authority to annul the Governor's August 30, 2012 concurrence."  (*Stand Up II*, *supra*, 64 Cal.App.5th at p. 215.)  We concluded "the people's rejection of Proposition 48 impliedly expressed their will to annul the Governor's August 30, 2012 concurrence for the Madera site."  (*Stand Up II*, *supra*, at p. 216.)  The rationale for this conclusion was voter intent and the extreme improbability

that the voters, by rejecting the tribal-state compact negotiated by the Governor and ratified by the Legislature, were expressing their preference for gaming to be conducted on the Madera Site pursuant to subsequently created secretarial procedures imposed by the federal government pursuant to IGRA. (*Stand Up II*, *supra*, at p. 216.)

The foregoing questions and answers lead to the question about timing and the impact of the annulment of the Governor's concurrence presented in this appeal—specifically, was the concurrence void from its inception or was the concurrence in effect until the people rejected Proposition 48. North Fork phrases the issue as whether Proposition 48 retroactively annulled the concurrence. North Fork presents several arguments for concluding the concurrence was not void ab initio as a matter of substantive law.

B.     *Prior Decisions*

First, North Fork argues that holding the concurrence void ab initio is directly contrary to *Stand Up II* and *United Auburn*. North Fork's interpretation of *Stand Up II* refers to statements that (1) a question presented was "whether the Governor's concurrence, *once given, can be invalidated* by subsequent action of the electorate" (*Stand Up II*, *supra*, 64 Cal.App.5th at p. 210, italics added) and (2) the people exercised a retained power "by impliedly revoking the concurrence for the Madera site [and, a]s a result, the concurrence *is no longer valid*" (*id.* at p. 201.) North Fork also refers to the statement in *United Auburn* that "the Governor acted lawfully when he concurred in the Interior Secretary's determination." (*United Auburn*, *supra*, 10 Cal.5th at pp. 543–544.) Based on this language, North Fork argues the concurrence was valid and in effect when given in 2012 and remained so until revoked in the November 2014 election. In comparison, Picayune-Chukchansi argues the language and logic of *Stand Up II* point to one possible interpretation of the decision—the Governor's concurrence was void ab initio.

20.

The scope of the "[l]anguage used in any opinion is of course to be understood in the light of the facts and the issue then before the court, and an opinion is not authority for a proposition not therein considered." (*Ginns v. Savage* (1964) 61 Cal.2d 520, 524, fn. 2; *Geiser v. Kuhns* (2022) 13 Cal.5th 1238, 1252 [cases are not authority for propositions not considered]; see 9 Witkin, Cal. Procedure (6th ed. 2021) Appeal, § 530, pp. 563–564 [ratio decidendi and dicta].) Applying these principles, we conclude neither *United Auburn* nor *Stand Up II* expressly or impliedly resolved whether the concurrence was void ab initio. The conclusion in *United Auburn* that the Governor had the implied power to concur in the two-part determination does not necessarily lead to the conclusion that the people lacked the power to render a concurrence void ab initio. Similarly, our conclusion in *Stand Up II* that the people impliedly revoked the Governor's concurrence does not resolve, one way or the other, the more specific question of whether the concurrence was rendered invalid from its inception or invalid from the date of the vote on Proposition 48.

In sum, although *United Auburn* and *Stand Up II* provide context for the specific legal question presented in this appeal, neither decision expressly nor impliedly answered that question.

C.       *Presumption Against Retroactive Statutes*

Second, North Fork contends basic principles of California law include a strong presumption against retroactivity. North Fork relies on decisions of the California Supreme Court recognizing "that statutes ordinarily are interpreted as operating prospectively in the absence of a clear indication of a contrary legislative intent." (*Quarry v. Doe I* (2012) 53 Cal.4th 945, 955.) In accordance with this principle, a statute that is ambiguous with respect to retroactive application is construed to be unambiguously prospective. (*Ibid*.; *Californians for Disability Rights v. Mervyn's, LLC*

21.

(2006) 39 Cal.4th 223, 230 ["presumption that statutes operate prospectively absent a clear indication the voters or the Legislature intended otherwise"].)

Picayune-Chukchansi contends the subject of retroactivity was addressed in *Stand Up II* and this court rejected North Fork's argument regarding "the troublesome retroactivity question" in the opinion's subpart labeled "Retroactive Annulment." (See *Stand Up II*, *supra*, 64 Cal.App.5th at p. 210.) We reject this overly broad interpretation of *Stand Up II*. We simply decided whether "the people could, or could not, revoke a concurrence given by the Governor." (*Id*. at p. 211.) The issue decided was limited to whether the electorate's authority over the Governor's implied power to concur had to be exercised *before* the Governor exercised that power and issued a concurrence or, alternatively, whether the electorate's power could be exercised *after* the Governor exercised that power. We concluded "the people of California retained the authority to annul a concurrence … *after it has been issued by the Governor*." (*Id*. at p. 212, italics added.) We did not reach the question whether the revoked concurrence was void ab initio.

Whether the general principles governing the retroactivity of a statute, including the presumption that statutes operate prospectively, should be applied to the electorate's implied exercise of its retained power to invalidate a Governor's concurrence is a question that does not appear to have been addressed in a published California decision. We are not convinced the nature of the electorate's invalidation should be determined using those general principles. Typically, a statute enacted by the Legislature or the people will govern future conduct arising in a variety of situations and, if retroactive, will be applied to past conduct. This application to a wide range of situations will not occur in this case. For example, Proposition 48 did not have a wide range of application like the Proposition 64's stricter standing requirement that applied to existing and future actions brought under California's unfair competition law. (See *Californians for Disability Rights v. Mervyn's, LLC, supra,* 39 Cal.4th at p. 232.) Rather, Proposition 48

22.

addressed two discrete acts already taken when it (1) expressly rejected the ratification statute, chapter 51 of the Statutes of 2013, and (2) impliedly revoked the concurrence relating to the Madera Site. In this narrow set of circumstances, we conclude a case-by-case analysis is more appropriate than an application of general principles regarding the retroactive application of a statute.

### D. *Federal Preemption*

North Fork also argues the declaratory judgment cannot be upheld because of "the bedrock principles of federalism and federal preemption limiting the authority of states—or voters in state referenda—to interfere with matters reserved exclusively for the federal government." Invoking the supremacy clause,[6] North Fork contends that any state law that interferes with or is contrary to federal law, no matter how clearly within a state's acknowledged power, must yield. (*Felder v. Casey* (1988) 487 U.S. 131, 138 [Wisconsin's notice-of-claim statute did not apply to civil rights actions under 42 U.S.C. § 1983 brought in state court because the statute was preempted as inconsistent with federal law].)

"Preemption is foremost a question of congressional intent: did Congress, expressly or implicitly, seek to displace state law?" (*Quesada v. Herb Thyme Farms, Inc.* (2015) 62 Cal.4th 298, 308.) "Congress may expressly preempt state law through an explicit preemption clause, or courts may imply preemption under the field, conflict, or obstacle preemption doctrines." (*Ibid*.) Here, Congress has expressly required "the Governor of the State in which the gaming activity is to be conducted" to concur in the Interior Secretary's two-part determination. (25 U.S.C. § 2719(b)(1)(A).) Congress,

---

[6]   The laws of the United States "shall be the supreme Law of the Land," notwithstanding anything to the contrary in the Constitution or laws of any state. (U.S. Const., art. VI, cl. 2.) Under the supremacy clause, Congress has the power to preempt state law. (*Crosby v. National Foreign Trade Council* (2000) 530 U.S. 363, 372–374, 120 S.Ct. 2288, 147 L.Ed.2d 352.)

however, has not granted governors "the authority to concur—that authority must come from state law." (*Stand Up II*, *supra*, 64 Cal.App.5th at p. 202, citing *United Auburn*, *supra*, 10 Cal.5th at pp. 548-549, fn. 4.) Consequently, Congress did not expressly preempt state law defining a governor's concurrence authority. Rather, Congress relied on state law to resolve whether a governor had the authority to concur and the terms and conditions for the valid exercise of any such authority. Given this reliance on state law, it necessarily follows that Congress did not impliedly preempt the state law that answers those questions about a governor's concurrence authority.

### E.   *Void Ab Initio*

Having addressed North Fork's preliminary arguments, we consider the substantive question whether the Governor's concurrence was void ab initio and divide it into two separate issues. The first is general in nature and asks whether the people's retained authority to annul a concurrence includes the authority to render the concurrence void ab initio. If the retained authority is that extensive, the second question is reached. It asks whether, in this particular case, the people's implied annulment of the Governor's August 30, 2012 concurrence should be construed as rendering it void ab initio.

Whether the people's retained power to annul a concurrence includes the power to render it void ab initio is a question of California constitutional law. Section 1 of article II of the California Constitution describes the people's power: "All political power is inherent in the people. Government is instituted for their protection, security, and benefit, and they have the right to alter or reform it when the public good may require." In this context, "political power" means "all governmental power." (*Dye v. Council of City of Compton* (1947) 80 Cal.App.2d 486, 490.) The word "all" means " 'the whole of' or 'the greatest quantity' … and 'every member or individual component thereof.' " (*City of Ukiah v. Board of Trustees* (1961) 195 Cal.App.2d 344, 347.) In comparison to

the people's retained power, the Governor's authority to concur was implied, existing in a " 'zone of twilight.' " (*United Auburn*, *supra*, 10 Cal.5th at p. 563.)

We conclude the proper balance between the Governor's implied authority to concur and the people's retained power to annul should be struck in favor of the people because, as a matter of California constitutional law, the Governor's authority is derived from the people. (*Stand Up II*, *supra*, 64 Cal.App.5th at p. 211.) Simply put, whether something is void ab initio is a question of public policy and the power to resolve that political question must exist somewhere. In our view of the California Constitution and existing legislation, the political or governmental power to declare a concurrence void was not fully transferred from the people. Thus, we conclude the retained power to annul includes the power to render the concurrence void ab initio.

Next, we consider whether the people's implied annulment of the Governor's August 30, 2012 concurrence through Proposition 48 should be construed as an exercise of their authority to render the concurrence void ab initio. In *Stand Up II*, *supra*, 64 Cal.App.5th 197, we concluded the people's vote on Proposition 48 impliedly annulled the Governor's concurrence but did not resolve the extent of that annulment. (*Stand Up II, supra,* at pp. 215–216.) The method of analysis used to determine whether an annulment occurred focused on voter intent. Applying that method here, we consider what voter intent is most logically inferred from the rejection of Proposition 48. That analysis considers the consequences of each proposed interpretation and which set of consequences most realistically aligns with the voter's intent.

The competing interpretations would render the concurrence (1) ineffective from its inception on August 30, 2012, or (2) ineffective from November 4, 2014, when the voters rejected Proposition 48. Under the latter interpretation, the concurrence would have been effective from August 30, 2012, through the date of the election, a span of about two years and two months. We conclude the most reasonable interpretation is that the voters intended to render the concurrence without any effect because there is little, if

25.

any, support for the inference that voters wanted the concurrence to remain effective during the period leading up to the election.  In other words, the voter's intent to reject class III gaming on the Madera Site strongly favors treating the concurrence as void ab initio rather than in effect until the election.

Consequently, we conclude the voter's rejection of Proposition 48 included an implied annulment of the Governor's concurrence that rendered the concurrence void ab initio.

### DISPOSITION

The judgment is affirmed.  Respondent Picayune shall recover its costs on appeal.

DETJEN, Acting P. J.

WE CONCUR:

PEÑA, J.

SNAUFFER, J.

26.